AFGE and AFGE will also come to speak. Mr. Matt, Ms. Bridley-Gillis, Mr. Wimko-Matz, and Mr. Kershman will speak against them for the election. Good morning, Your Honor. My name is Joshua Matz. I represent plaintiff Appellant Nia Lucas. I hope to simplify things this morning by zeroing in on the most straightforward basis for reversal. In our view, this is fundamentally a Thunder Basin Step 2 case. The key question, therefore, is whether the CSRA evinces a congressional purpose to preclude claims of this kind, namely federal anti-discrimination and retaliation claims against federal employee unions, from being filed in district court. And the answer to that question is no. There are four fundamental reasons why that is true, a principal reason that in my view is sufficient, and three significant supporting reasons. And if you'll allow me just a minute or two to set the table, I'll summarize what those reasons are. First and principally, the CSRA does not create effective or meaningful judicial review here. When a federal employee grieves a discrimination issue against her union, and that grievance is denied by the FLRA's regional director and general counsel, as happens in virtually all cases, there is absolutely no right whatsoever to judicial review in any court. So a finding of preclusion would foreclose judicial review of virtually all discrimination claims against unions decided by the agency. That alone, distinguishing this case from all those decided by appellee, where the plaintiff's claims could ultimately, in at least some form, reach a court, and then argue that as a sufficient basis. Are you sure that it can't reach a reviewing court? Because if the general counsel agrees, then it goes through a process and there's a final... right, if the general counsel sustains, I guess, the grievance? So this court actually lays out insurgent versus FLRA, which is a case from 1982 that's cited in our reply brief. Basically the way the act works is if a grievance succeeds before the regional director or before the general counsel, then it can potentially go to the FLRA and from there to a federal appellate court. But if a claim does not succeed at that stage, which studies indicate is the case for roughly 99% of claims, then there is no further right of judicial review. I think the legal standard says any right, and it just seems like there is a right, although unlikely. Respectfully, the standard is meaningful or effective. That's the phrase the court has repeatedly used. But it would be meaningful if you succeed and go to the... that's meaningful review. So I guess I'm focused on any not meaningful because you can't say that it's not meaningful review if you succeed and you go all the way through and get a ruling from the federal circuit. Respectfully, I disagree with that. As Justice Kagan pointed out in the Axon Enterprise case, the premise underlying this step in the Funder Basin Step 2 inquiry is that it would be passing strange, and it is certainly not the norm in our system, that a claimant never has a chance to get to court. And in particular, that agency actions... But they never, and if they succeed, then they do. Sorry to interrupt. What she highlights is it's unusual for there not to be some opportunity for there to be judicial review of agency decisions. And the rule has never been that the Funder Basin Step is satisfied. If you win in the district, if you win in the agency, and then you have the possibility, I suppose, of losing in federal district court, the concern is on the part of the person bringing the claim. Accepting the district court's finding would mean that if the agency rejects the claim of discrimination, which, again, happens virtually always, then there is no ability at all to get into district court. So the only circumstance... So, Mr. Matz, on this first factor, is there another case other than Axon on which you would rely for showing that this scheme doesn't allow for meaningful judicial relief, or do you think Axon is the best comparison? I think the Free Enterprise Fund versus PCAOB case is our best case on that. And the reason I would refer to that case is there, what the Supreme Court emphasized, is that although certain decisions could go to the commission and then ultimately to a court, not all board decisions were memorialized or encapsulated in a final commission ruling. And the fact that there was a gap there, where there's some internal process could lead not to judicial review, was sufficient to treat that first step as satisfied. And what I would highlight is that having reviewed a great many of this court's cases on the topic, I haven't found a single case in which this court has ever said that if the agency rules against you and you have no opportunity for judicial review, that would support a finding of preclusion. So here's my question about this. So I fully appreciate the argument. But what Thunder Basin is doing is an inquiry into congressional intent, right? It's not that there's a substantive right to judicial review. And instead, one reading of, especially Axon, right, is you have an ill fit for this type of claim within the statutory scheme. In other words, its chances of meaningful judicial review are much lower than the normal claims that Congress obviously intended to go to the agency. And the point being that even if you are correct that you only have a low chance of judicial review, it's exactly the chance of review Congress saw sufficient for every unfair labor practice. In other words, you wouldn't be somehow disfavored in terms of your chances of judicial review compared to everything else the FLRA does. Does that concern make sense, and can you give a response? It does make sense, and I have two responses to that. And they're sort of different kinds of responses. One response, and this is sort of a bigger point so we can come back to it, is that in addition to the lack of judicial review, we think there are additional features of the Title VII of the Civil Rights Act framework and the ADA framework that would further support not having preclusion here. And I can come back to those because those in my mind are also helpful. But on the specific point that you're asking, the way that the scheme works, as you point out, is that there isn't in general the ability to get federal district court review of agency decisions denying unfair labor practice grievances. But as the Supreme Court made clear in Kalios, there's no implied cause of action in general to bring a student federal district court relating to a breach of the duty of fair representation in this setting. And so the thing that you're saying can't otherwise be brought to court is a claim that doesn't exist, which would be that kind of standalone claim. The practical implication of that is that there's a kind of unique disfavoring in the way that this is set up of discrimination-related claims in particular. And I do think that that is a somewhat specific circumstance. Can you explain why that's unique? Because I think what Judge Garcia is getting at is that the CSRA says in 7116B that it's an unlawful labor practice to discriminate against an employee for a list of things, including on the basis of sex and handicapped condition. And so maybe Congress just intended that there wouldn't be anything beyond this. Look, what you get is what you get in the CSRA. Sure. I have a few responses to that. But I want to start by rejecting the premise, if I can. 7116B4 doesn't apply to this case because it only applies to discrimination by labor organizations relating to the terms and conditions of membership in the labor organization. But that's what we have before us, isn't it? It is not. Ms. Lucas was not a member of the union, which probably explains why Apelli, nowhere in their brief relies on 7116B4 as the font of the prohibition on discrimination. They instead rely on 5 U.S.C. 7114A1. This is clear at Apelli brief, page 36. Under 7114A1, the relevant sentence that they rely on is a sentence that says, an exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor union membership, organization membership. They take the position that that language encompasses comprehensively Title VII, ADA, and FLSA anti-discrimination protections. That's the first thing I just want to clarify, which is they're actually not relying on that. But the more basic point is that even if you grant the premise, which I don't, that under the CSRA, the prohibition on discrimination is coterminous with that in the anti-discrimination laws and that such discrimination is characterized as an unfair labor practice. The fact that it is an unfair labor practice does not automatically imply that federal district courts are otherwise divested of the jurisdiction they would have under 28 U.S.C. 1331 to hear a claim. And the way that courts have traditionally approached that, as I pointed out, is the funder-basin inquiry. The fact that if the agency denies the discrimination claim, you can never get into court on it, is at least one reason to have some skepticism that Congress would have intended no judicial review of discrimination claims that the agency doesn't accept. But the more direct approach is it's an unfair labor practice, and Congress didn't intend for any of these unfair labor practices to get into district court. Well, I think that's the question that we're really talking about here. No, no, I didn't want to interrupt your answer, but it's just in my mind that you had four reasons, and I'd love to just, for understanding where you're coming from, have those at some point, but I didn't mean to interrupt. Why don't I put those on the table, if it's okay? Happy to talk about them more. Right, so as I indicated, under funder-basin, the ultimate question is how to understand what Congress has done. The first traditional funder-basin factor is judicial review, as we point out, if the agency denies it, you can't get review. We think there are three additional reasons that it doesn't make sense to think that Congress would have wanted to preclude these claims from getting into district court. First, there's a powerful congressional presumption that the Supreme Court recognized years before the CSRA was enacted that Title VII protections operate concurrently with other statutory schemes. So this is, for example, the opposite of the norm in the constitutional setting, where usually if you have a mixed constitutional and agency claim, you have to exhaust the agency machinery before you go to court. The presumption is flipped in this context. You presume that Title VII operates concurrently. The second reason that it wouldn't make sense to think Congress did not intend preclusion is that that would leave federal employees with a second rate slate of anti-discrimination protections vis-a-vis their own unions, which would separate them starkly from the protections that federal employees have against their government employer, and that would separate them from the protections that private employees have against both their employer and their union. In that grid, federal employees as against their unions would be uniquely disadvantaged remedially, substantively, and procedurally with respect to discrimination. There's no evidence that Congress meant that result. And the final reason that it makes sense to think that there wouldn't be preclusion here is that Congress expressly preserved district court jurisdiction over anti-discrimination claims arising under Title II of the CSRA, which involves prohibited personnel actions by the federal government as an employer against their employees. The unions would have us believe that the inference from that is they didn't intend such a savings to operate here. But I actually think the opposite inference is the more natural one. Congress believed the CSRA scheme was perfectly consistent with the exercise of concurrent jurisdiction. They said so expressly in the context of prohibited personnel actions. It made sense that they did that because that provision, which works a waiver of sovereign immunity, expressly referenced a whole series of specific federal anti-discrimination laws as prohibited personnel actions, and they wanted to make sure that in doing so they didn't inadvertently strip away the jurisdiction that would otherwise exist for claims under those statutes. Given that discrimination is also expressly mentioned in the two provisions we previously talked about, both 7114A1 and 7116B, why would that also spark them to say there's a carve-out, there's a savings clause? I think for two reasons, a kind of formal one and, if I can, a practical one. The formal one is that having expressly articulated that the provision that covers prohibited personnel actions incorporates and they actually enumerate a specific series of federal statutes, it would make sense that they felt like, oh, but we also want to be really clear that we're not removing the jurisdiction that would generally arise under those claims. Whereas here, they described the prohibition on discrimination in frankly just rougher and shorter and more abbreviated terms. There isn't an express enumeration in anything like the same way of the incorporation of those provisions. With respect to 7114A1 in particular, and I would highlight this, when you're not a union member, the only protection you have against discrimination is when the union is representing your interest. It doesn't on its face prohibit discrimination against you in other ways, which the union all but admits when they treat the sexual harassment that happens here as not part of the representational conduct. The implication of that would be that Congress essentially intended a gap in which you both can't go to federal court, but also you get weaker anti-discrimination protections. I think the more natural question to ask is, would Congress have intended a sort of skim milk anti-discrimination regime here when in the private sector context, under Title VII of the Civil Rights Act, unions are actually subject to a broader duty of non-discrimination than employers are? The question is, why would they flip that here? To me, that supports the inference that under Title II of the CSRA, they expressly authorized it because they needed to be extra careful given their enumeration of these provisions. How do you deal with our case law that says, if Congress wants to preserve remedies outside the CSRA, it does so expressly? For starters, all of those arose in the context of Title II, where it makes more sense to think that that would be the case because of the way they expressly carved out the anti-discrimination clause. It doesn't say under Title II, it says the CSRA. Well, those cases arose in the context of Title II, and so at best it's dicta for them to be cross-applied without any sort of consideration to the pretty different scheme that applies under Title VII of the CSRA. But even acknowledging that, the question still remains under the Thunder Basin analysis whether the traditional factors for preclusion apply. Because this Court's decisions, which do admittedly have some broad language, I think better apply to that Thunder Basin Step 1 way of thinking about it. Is there a comprehensive scheme? And in asking whether there's preclusion in the second step, I mean, think about the Trump case, the AFG versus Trump case. Judge Cordova in that case didn't just say, well, there's no expressive carve-out, so you lose, which would essentially follow from the reasoning that Your Honor just described. He wrote a quite lengthy opinion in which he really highlighted the fact that there were at least three administrative ways in which you could ultimately get judicial review. That was Judge Griffith. I'm thinking of the Jarchese case in which Judge Traylor-Ross similarly had a quite comprehensive analysis. But this Court, in its more recent opinions, and that includes Judge Cordova's recent Ahuja case in which you did the same thing with respect to OPM employee benefit determinations, where you highlighted the fact that there's ultimately an appeal to the APA through the APA and to the Federal District Courts. All of the cases engage in that analysis instead of just saying it's preclusive unless there's an expressive carve-out, which is why we think this mode of analysis is correct. Can you just address Thunder Basin Factor 2, if we're going to think about it that way? My understanding is at least some of our cases can be read to say, basically, can the same conduct be redressed, or is this something that is totally collateral to the types of claims that the agency typically considers? And it struck me that that might be a difficult factor for you. What's your argument on Factor 2? I'm going to have two points. The first is that it's okay if I don't win on that factor, and the second is that we think we have a good argument under it. So let me start with the first point, which is that the Supreme Court and this Court have repeatedly emphasized that the three Thunder Basin considerations are not mechanical, that you don't need to have all of them, right? The Supreme Court made that clear in Axon. This Court highlighted that in the Trump case. And the reason I want to emphasize that is some of the points that I foregrounded at the beginning about the presumption about Title VII operating concurrently, about the peculiarity of a skim milk anti-discrimination regime here. You can think of those as loosely tracking the second and third Thunder Basin considerations, but maybe not. Maybe they're not the best fit, but we think there's still really powerful evidence of how you would think of congressional purpose, and I just want to emphasize that. But with respect to the second Thunder Basin factor, which is it is wholly collateral to the agency's review provisions, that has been spoken about in a bunch of different ways. That factor, I have to admit, has always struck me as not a model of precision. Sometimes courts talk about it as, you know, does your claim have nothing at all to do with what's going on in the agency process? That's the Free Enterprise Fund's way of thinking about it. In other key contexts, the court asks, can you get the same remedy, right, which is how the Supreme Court foregrounds it in the Axon Enterprise case. And in other contexts, it seems to be more of a gestalt inquiry into does this feel like it's related or not. You know, from the perspective at least of the remedy inquiry, which is the Supreme Court's most recent guidance, we think that the remedies that you can get within the agency with respect to discrimination are quite significantly and starkly different. All you can get within the agency process, if you make it all the way, which no one does, is a make whole remedy in general. You can get an informational poster. You can get a requirement of getting back pay. You can get reimbursement. You can't get compensatory damages. You can't get punitive damages. Is it clear that you can't get compensatory damages? It's certainly clear that FLRA doesn't think you can impose penalties, so nothing akin to punitive damages. But you can have a make whole remedy and at least be – I just couldn't find a clear answer about the scope of the FLRA's authority to give a make whole remedy that looks a lot like compensatory damages. I haven't found a case that says you can't, but I also haven't found anything that says you can. And I've read a lot of FLRA opinions, and maybe my friends on the other side will be able to indicate one, and if so, I'll happily concede the point. But we have not found authority for that proposition. The EEOC, I should note, reached the same conclusion in there, and it gets raised based on their understanding of how the FLRA operates. And I would note on this second factor, and this maybe relates both to the second and third funder-based consideration. The EEOC has long understood it to be the case that someone in my client's position is not precluded from going to EEOC and going to that agency and going to federal district court. Also, the FLRA. So if you go on the FLRA website, and I'm not sure this is in our papers, and if it's not in it, it would be helpful. I'm happy to submit this in a supplemental letter. But I spent a lot of time on the FLRA website in advancing this hearing. They have a section on their website that is advice for employees who want to bring unfair labor practices. And in that part of their website where they offer advice about what to do if you would like to bring an unfair labor practice, what they tell you to do is to go to the EEOC. Here's the exact language. If you believe that you have been discriminated against because of race, ethnicity, religion, age, gender, national origin, or sexual orientation, contact the Equal Employment Opportunity Commission for the EEO office at your agency. And when we more broadly, and we do cite these materials in our papers, when we more broadly looked at, like, has the FLRA addressed these sorts of things, which goes partially to the collateralism angle and partially to the agency expertise angle, the short answer is no. I could not find a single opinion at all of the FLRA in which they resolved, at the FLRA level at least, a claim of discrimination against a union on the protected characteristics at issue here. Right. We don't see the claims against the union. But isn't that language on the FLRA website telling the employees it represents what to do in the event that they've been discriminated against on those bases by the employer? It's not, because that's on the page for unfair labor practices, which are distinct in kind from prohibited personnel practices. Prohibited personnel practices govern the relationship between the employer and the employee. Unfair labor practices, which are set forth at 7114B, sorry, 5 U.S.C. 7116B, govern the relationship between the union and the people within the market. You said there's a separate page on prohibited employment practices, or that – I know there's a separate provision, but you're saying there's a separate page for it? Like is this ULP, sort of like you've got a ULP, hey, if there's a discrimination piece of what's happened to you? I'm just trying to – I haven't looked at any of that. If it's helpful, I'm happy to just submit the website after the argument. But part of what we struggled with here is it seems to me improbable that there are no instances of federal unions being accused of discrimination on these grounds by their members. But there are, as you know, exceedingly few federal district court cases that address this. There are a few. There's a sort of split of district court authority about whether you can have a Title VII claim in this circumstance. And so I thought, well, maybe there's just a whole bunch of FLRA cases that would evidence the fact that this is part of their normal process, and they do this all the time, and it's within their expertise. Well, that might be because 99% don't get a complaint and get to a hearing. Well, so I think that may be part of what we're seeing, which is that the agency's online outline of case law that they make publicly available from their general counsel's office does not provide any examples of this, that they're on their website telling people to go to the EEOC, that there's no FLRA authority about this, and that all of the available public data is that to the extent claims of this kind are ever brought, and even under the B6 provision that Your Honor was referring to, they reported in an eight-year period only 26 of which, every single one of which failed within the agency. Before it got to the FLRA stage... Can I ask you about, you said as a factual matter, I think it's B4, doesn't apply because she wasn't a member of the union. Yes, Your Honor. My understanding from the brief was that part of the conduct at issue here is that the union terminated Lucas's membership, such that she was a member. She's complaining about a whole host of actions, including her termination of membership, but that for that reason, B4 would apply. I agree that this is confusion. Based on my review of the record and of what the district court concluded and my conversations with my client, which I appreciate is not part of the record, my understanding is that she was not part of the union, and that what she was referring to in that part of her pleading was that she was essentially kicked out of the bargaining unit, that they wouldn't advocate for her or represent her anymore, but that she wasn't talking about union membership in the D6 sense of the term, as that provision would apply here. Some indication of that is that the appellee, despite having every reason in the world to have featured B6 prominently in their brief, or B4, I'm sorry, B4 prominently in their brief, didn't, and instead they locate, and it was sort of an arresting sentence, they locate the entirety of federal anti-discrimination law in this context within 7114A1, that's at page 36 of their brief. I understand, and can you address, I mean, what I hear you saying is that you contemplate parallel proceedings before the FLRA and in the district court, but isn't that exactly what the CSRA is trying to effect? It doesn't want duplicative proceedings, it doesn't want contradictory rulings on the same sets of facts, so how is this consistent with the intent of the CSRA? Sure, two responses to that. One of which is about Title II of the CSRA, and the other of which is actually about the NLRB. So let me start with the second of those. There have been, just to start, a number of federal district court cases, the EEOC cites them in their amicus brief, in which Title VII claims were brought in a similar posture to this one, and district courts seemingly sort of didn't do a, they just didn't have that question in front of them, but they did address them as it were on the merits, rather than from a posture of jurisdiction or preclusion. So there's some authority that district courts have done this, so it's a thing that can happen. And in the NLRB context, which strikes me as a decent analogy for this one, the norm is of concurrent jurisdiction over fair representation issues when they encompass the discrimination aspect. What about state or local employees versus their unions, as opposed to, you just referred to the concurrent jurisdiction for federal employees versus their employers. What about state or local government employees versus their unions? Also a good analogy, I would expect. The idea that you can have simultaneous, that discrimination by a union against its members can give rise both to an administrative process and jurisdiction in a federal district's court over a claim is the norm, not the exception in federal labor law. We have a bit of an odd terrain here, where we have circuit precedent of our own, building off of Supreme Court precedent about the CSRA, that both pre- and post-Thunder Basin, that doesn't use a Thunder Basin analysis. And, you know, one takeaway from that is that it doesn't matter for purposes of understanding Congress's intent in the CSRA whether the individual may not get as good remedies or even any remedy at all. And I'm just wondering, how do we square that with the Thunder Basin analysis that you lead with, that you feature, really to the exclusion of all that doctrine? Fair question. The way I would approach that is to say the following. In its most recent guidance on how you approach preclusion in the CSRA context, the Supreme Court in Elgin applied the Thunder Basin factors. I think that by itself renders any other approach inconsistent with binding Supreme Court precedent. Axon Enterprise further confirms that, and this Court's recent decisions in cases like the Trump case, the Ahuja case, indirectly, which are case-by-case, all support that idea. The more modern cases, and certainly the Supreme Court's guidance, has been that Thunder Basin does provide the appropriate analytical framework from which to approach this issue. Although Thunder Basin does just try to get at Congressional intent, and sometimes there's more direct evidence of Congressional intent than having to go through those factors. But can you address the case of Spagnola v. Nafis? I'm talking about not the ongoing one but the panel opinion. And that seems to be quite on point in some ways. Are you familiar with this case? This is the case where there was an employee that wanted to proceed under 42 U.S.C. 1985-1. Is this a Bivens case? Well, there was a Bivens aspect which went en banc, but there was also a claim to proceed under statutory provision. I apologize, I'm not familiar with the case. So, it was written by Judge Skelly Wright, and he says, this is Section 3 of the opinion, whether Congress in enacting the CSRA may permissibly have foreclosed Spagnola's resort to a pre-existing statutory action is a question entirely distinct from the foreclosure of his constitutional claim. And then he goes on to talk about the statutory, the way CSRA interacts with the statutory claim, and ultimately he says, CSRA is the exclusive remedy for aggrieved federal employees advancing non-constitutional claims. And that seems to be a pretty strong statement that these Title VII claims would be precluded. Title VII predated the CSRA, and it was a pre-existing statutory claim, and this case says that CSRA is the exclusive remedy. Was that a case that involved a union, or was that a prohibited personnel action case, if I may ask? I believe it was a union. Okay. Well, I'll take the court at its word on that. What I would say is that if that were the rule, then a great deal of this court's jurisprudence since then has involved needless expenditure of energy, because there have been a number of cases, including Judge Pillard, your case, the Ahuja case, in which you did not simply say, oh, well, there's a challenge to this OPM personnel action. The CSRA is implicated. It's a statutory claim in character. Therefore, you know, cite that case. It's over. This court has repeatedly gone through that analysis, including in the Trump case. And, you know, in some ways, I think that there's a collision of two instincts here. One is that the CSRA is really broad, and this court has repeatedly held that it precludes a lot of things. The only thing that a circuit court has expressly held that doesn't preclude is defamation claims in some circumstances. We refer to that in our applied brief. On the other hand, this court has never held that Title VII is precluded by anything. And the irregularity of finding Title VII to be precluded is only magnified by the fact that four years before the CSRA was enacted, the Supreme Court said in the Alemander case that the baseline assumption here is that Title VII operates in parallel to other schemes. And you would have to infer that when Congress enacted the CSRA, they specifically contemplated a circumstance in which federal employees, as to their unions, have worse and weaker and substantively narrower anti-discrimination protections than every other class of public and private employees against their employers and unions. And that seems like a big reach to me. Can we talk about that? Because it seems that there is some support for that. First, there is this statement. This is in HDF v. Federal Labs. It's a Supreme Court opinion that Congress unquestionably intended to strengthen the position of federal unions and to make the collective bargain process more effective in the CSRA. So they were trying specifically to do something for federal unions versus other. And then in the Carajalios opinion, they talked about the differences between, I guess, private collective bargain-type agreements versus the situation of federal unions. And it said that it's finding an applied right of action for duty of fair representation to the NLRA. And it stressed that by providing for exclusive bargaining agents, the pertinent statutes deprived bargaining union employees of their individual rights to bargain for wages, hours, and working conditions. So it was critical that unions be required to represent all in good faith. That's the private unions. However, Title VII operates in a different context. Title VII of the CSRA. As the United States' amicus explains, the federal employment does not rest on a contract in the private sector sense, nor is it clear that the deprivation of a federal employee suffers from the election of a bargaining agent. If there is such a deprivation, it's comparable to the private sector predicament. Moreover, the collective bargaining mechanisms created by Title VII do not deprive employees of recourse to any of the remedies otherwise provided by statute or regulation. This is Carajalios, and it's noticing the differences between private unions, unions representing private employees and government employees, and noting that there are substantial differences where unions who are relying on, I guess, private sector unions to represent them are much more dependent on them than the federal sector ones because there are statutory protections and other things for federal employees. I completely take the point, but the fact that, and I understand that the underlying congressional design in the CSRA was to strengthen the position of federal employee unions to bargain with the government on behalf of their bargaining units as compared to the haphazard and scattershot scheme that existed before 1978. But it doesn't follow from the fact that Congress intended to strengthen the positions of unions in bargaining on behalf of their employees, on behalf of the members of their bargaining units, that it also intended to strengthen unions' ability to engage in race and sex discrimination against the people they're supposed to represent. I just don't think that follows. And it's true that in Carl Hallios, the court made clear that it was reluctant to imply a private right of action under the jurisprudence that had developed around implied causes of action that had kind of overthrown the Ancien Regime and replaced it with a more stringent approach. And in doing so, it highlighted that the statutory structure was not one that came to contemplate freestanding federal causes of action for DFR claims. But here, we're not talking about whether to imply a cause of action. We're talking about whether to strip courts of jurisdiction over Title VII claims. I understand that. This just speaks to the idea that there are reasons to treat public employee unions differently from the ones that represent private employees. I agree. And to me, the question is, how do we think Congress intended that they be treated differently? And did Congress intend that they be able to discriminate more? And that if they did discriminate more, that there would be fewer remedies and worse procedural protections available to those against whom they discriminated. I don't see evidence of that. It just seems that that seems to be the case in many of these CSRA cases where they find that all these other things are precluded. Other people can bring these claims, but you can't under the CSRA. Why is this any different? I disagree with that, Your Honor, respectfully. I mean, in all of those other cases, everyone, every case cited by Appellee, every case by this court, this court made clear that a significant part of its conclusion was that the dispute could ultimately go to a court for review. There were cases where it said you can't have a pre-enforcement challenge, you have to do it in the context of a conflict bargaining dispute. There were cases that said... But we've had cases that say you don't have a claim here, and just because you don't have a claim here and you can't have a claim anywhere doesn't mean that you get one. And we have cases that say it doesn't matter what the remedies are, because it seems to me that the CSRA specifically talks about discrimination. It's not like this is something new. And you're saying, well, Title VII gives us remedies of damages and attorneys' fees. But we have case law that says remedies doesn't matter. It's about the comprehensiveness of the scheme. I just think it's hard to get around the case law. I mean, if we were writing on a clean slate, it might be different. But given everything that's here, I think your position is difficult. I appreciate that. I believe you can and should get around that case law that you're describing. And if you want me to draw a few distinctions to help you do it, please, I'll do that right now. Some of those cases are really highlighting the fact that pre-enforcement or systematic or nationwide challenges are not the appropriate means by which to attack certain alleged illegal action. That's the Air Force case. That's the Trump case. There's a number of other cases in that line. But in all of those cases, the crux of the court's reasoning is you can still challenge this. You just have to do it in a more concrete, individualized way that can still go to a federal appellate court for review at the end of it. That isn't the case here. Then there are a number of other cases in which the court says, and this is kind of like how Carl Hallios reasons about it, and there's a few others as well, that with respect to a class of persons who don't appear to have any rights vested in them by the statute, we're not going to infer that they should have a right because the scheme otherwise looks like Congress tried to pretty clearly decide who gets rights and who doesn't. And so we're not going to imply causes of action on that basis alone. And then there's a third class of cases where the court says, well, even if you don't get the same remedies that you could get with a standalone federal cause of action, you get remedies that are sort of good enough, or something, and you can ultimately go to court on the substance of your claim. What's most striking and different here, what separates this case from all the others, is not only that the anti-discrimination protections within the agency are worse, it's that if you bring a grievance about them in the agency and you don't succeed, you don't get judicial review. I can't think of any other case in which a federal court has held that if someone discriminates against somebody in an agency setting and the agency rejects their claim and there's no further judicial review, you lose anti-discrimination protections that you otherwise have as a matter of federal law, which are themselves broader, not just in remedy, but in what they prohibit, than the relevant intra-agency anti-discrimination protections. To me, that would be a startling announcement for this court to make. And again, remember that Congress passed the CSRA in 1978. I keep going back to this because the Congressional Intent Inquiry is an important part of it. They passed it against the recent enactment of Title VII as a crown jewel of the civil rights movement, against the Supreme Court's declaration that it presumptively exists alongside any other remedies that may exist within the law. They put into Title II of the law an express savings clause, which I think they needed because of the way they wrote that provision, but in my mind, very clearly evinced their understanding that Title VII remedies would exist concurrently. How much of this argument turns on the idea that she wasn't a member of the union? Because one powerful argument on the other side to exactly what you just said is that, at least as the 716b-4, it sure looks like Congress looked at Title VII and maybe the Rehabilitation Act and wrote an unfair labor practice that, yes, the introductory language is slightly different, but it says it's an unfair labor practice to discriminate on all of these exact bases. And in that situation, if that were the case, I mean, I guess you would still have all of the same arguments, but it would be far more difficult to say, oh, Congress just didn't think about... Well, here's a different way of putting it. Isn't 716b-4 an affirmative indication that Congress thought about discrimination claims and said they can and they should go to the FLRA? I think it is. I do think it is that. The question is whether you infer from that a further assumption that they thought they couldn't also be brought in federal district court, which is that kind of preclusion question. But, A, the fact that she was not a member of the union is certainly helpful to us. I won't deny that. On the other hand, even if you look at 5 U.S.C. 7116b-4, it doesn't create a categorical prohibition on discrimination. And this is the EEOC's major argument in its brief. We make this point as well. It doesn't sweep nearly as far as the general federal anti-discrimination protection because all it refers to is the terms or conditions of membership in the labor organization. And there are many other respects in which a union discriminates against people within its bargaining unit or even against its members that may not fit that category. The union certainly thinks that should. What's an example of that? Well, they seem to believe sexual harassment would fall within that compass. And more generally, when we look at FLRA cases that seem to address this in the case outlines, they all refer to... Those cases all seem to involve kicking people out or not allowing them into unions, and you don't have the terms and conditions type jurisprudence that you would expect to see that would be maybe more analogous to the Title VII of the Civil Rights Act. But it's a totally fair point, which is Congress understood that some forms of odious discrimination would be unfair labor practices with respect to the way that unions treat members of the unions in some settings. The question, then, is with respect to the way that unions treat non-members who are part of their exclusive bargaining unit, which would be my client, and with respect to the way that unions treat their members outside of the limitations of before, is it fair to think that Congress thought it was stripping federal district courts of the jurisdiction they already possessed under Title VII and that they would in the future come to possess under the ADA and the FLSA? We think the better position is no. The FLSA seems different. How much of what you're arguing... I mean, there's no Alexander v. Gardner Denver. There's, you know, it's more labor law-ish. It doesn't have that pedigree, that kind of supercharged character. It's not dealt with in the employer part of the CSRA. You don't, you know, in the reply brief, really say much about Lucas's FLSA claim. We think the FLSA claim is on a somewhat weaker footing than the Title VII and the ADA claim. We think it is fully consistent with the broader congressional design that a retaliation claim in that setting could be separately filed, but I think the stronger part of our case is in the ADA and Title VII law. I'm wondering about this distinction between 116B and 114A1, because you're telling us that she's not a member of the union, so only 114A1 applies, but don't we have to go by what's in her complaint? Because she says that she was expelled from the union. Do we need to treat her as a union member for our purposes, because that's what she alleged? So I can pull the relevant parts of the... I think the complaint is a little unclear about whether... It says expelled her from the union. You know, this was, you know, pleaded, I think, in a way that was not a model of clarity. You should have been affirmatively plead she was... Sorry, go ahead. No, no, no, I'm just listening. I think I agree with you that it means that she was not given the representation. Yeah, she was kicked out of the bargaining unit. They essentially stopped... I know I understand what the actual facts are as you're representing them, but I'm just wondering if we have to go by the facts that are in the complaint or that the complaint treats her as a union member. Given the sort of liberal pleading standard that applies here and given the context in which she's describing what occurred, which is they stopped representing her with respect to her union matters, I think the complaint can be fairly read as supporting that interpretation. And I'm happy to do... I just don't have this right in front of me. I'm happy to revisit it and, if helpful, submit a 28-G letter to indicate where in the complaint we think we may find further support for that. But you agree we have to go with what's in the complaint? I agree that you should leave the complaint in the light most favorable to my client, accounting for all the circumstances and recognizing that this is a 12b1 and not a 12b6 motion. So you agree it's the complaint that we construed? Yes. Okay, thank you. It's certainly nothing else. It's certainly nothing else. But, again, I have to be clear. Our case does not hinge on the inapplicability of 7116b4. We think that it is even clearer with respect to non-members. But as I explained in my colloquy with Judge Garcia and as I think Judge Pillard has also brought out, there are a number of respects in which it is not apparent that b4 evinces that congressional purpose to oust districts courts of the jurisdiction they'd otherwise possess. I'd just like to go back to Stagnola, if I may. And I'm sorry that I know that you haven't read this, but I'm told that it is against an employer. So given that it's against an employer, but it speaks broadly about the CSRA, how should we look at a case that says that, you know, you have the statutory remedy? Sure. Let me answer that more broadly. This court has a bunch of cases in the employer context, which is Title II of the Civil Service Reform Act. As we've already had a colloquy about, that is written differently in a number of respects, including its expressing location and discrimination protections, the express savings clause for jurisdiction. In deciding those cases, this court has used some broad language to describe the CSRA. But haven't we also used broad language to talk about the union provision to say that it also is a comprehensive scheme intended to do all the things that Title II does? It's intended to do all the same things as Title II, because it obviously exists for a different purpose than Title II. It does, but in terms of being comprehensive. I think the court has said that in a way that does, from my perspective, make this not a Thunder Basin Step 1 case. But if the court's early holdings on that point were taken as foreclosing any possibility of any statutory claim outside the CSRA framework, then again, there have been a number of recent decisions from this court, including the Ahuja case, that don't, in my mind, make a great deal of sense. I think the way the court has understood that language is, if you want to call it as a thumb on the scale, the court is clear, and I won't deny this, the court has made clear that there is a broad effect of this statute, that it covers a lot of ground, that it is preclusive against the APA and against Bivens and against a variety of other types of claims, for all of which you could go to federal district's court and get review if you lost in the agency, and which didn't have the same history as these anti-discrimination laws. But I don't take those cases as a categorical statement that everything is precluded by the CSRA without regard to Thunder Basin or anything that follows it. And to the extent they said that, I think they are incompatible with Belgian and Exxon Enterprise. So if we look at Spagnola, and it says that all pre-existing statutory claims are precluded by the CSRA for employment cases, what would be the reason to distinguish the union cases? Other than the fact that it's a union case versus an employee case. The fact that you're interpreting Title II of the statute and not Title VII, and you're just using the word CSRA, if I'm honest, strikes me as some overdrafting. I don't think that when a federal court issues an opinion about Title IX of the Civil Rights Act, governing gender discrimination in employment, courts don't ordinarily assume that that also comprehensively applies to Title VII and Title VI and to every other part of the Civil Rights Act, even if in the opinion they refer to the Civil Rights Act. I think referring to the CSRA as a shorthand, because the actual acronym for Title VII, the FRM, it's long and annoying and none of us know it. I certainly couldn't pronounce it right now if I tried. LMRS. Just like I haven't spent this argument referring to Title VII, because it turns out that would be very confusing. We call it CSRA. There you go. I defer to the court. But just like courts refer to the CSRA in those cases, they're simply not referring to the set of statutory provisions that we are interpreting here and from which we have to define congressional intent. And if the question is, did Congress in Title VII of the CSRA intend to create a skim milk anti-discrimination regime for this class of people against their union, unlike in the private sector and unlike everywhere else in the public sector, it would seem to me that you would find some evidence somewhere of that purpose, and there's no evidence of it to me. But why isn't the evidence that they put it in this 116B provision made it a ULP? And we all know that if it's a ULP, you don't get to go to federal court. That's their intent. They put it in this provision. At the risk of repeating myself, I think that that provision is narrower than the substantive anti-discrimination laws. The EEOC emphasizes that. It's clear on the face of the language, which refers only to membership in the labor organization and doesn't refer more broadly to any of the activity by the union, which is what you see in 42 U.S.C. 2000, whatever it is that governs unions. So it's a narrower provision than that. And the fact that Congress would have made some discrimination by unions against their members with respect to the membership in the organization in unfair labor practice, it doesn't automatically follow from that, that they would have intended to preclude the presumptive existing baseline protections that the Supreme Court had just told them were baseline and that they are expressly carved out elsewhere in the statute where the need to do so was highlighted by their direct incorporation of that law. So it's not contact-to-effect specific. There's no CSRA preemption of Title VII or ADA claims against unions. It's just parallel to the express employer preservation. That would be our position. And to the extent the Court is in doubt, I would emphasize that the... at least as to a non-union member, the case is stronger still. All right. Thank you. Kept you up for a long time. Thank you. Thank you for your questions. Now we'll hear from the EEOC. Mr. Winkleman. Good morning, Your Honors. And may it please the Court, Stephen Winkleman with the EEOC. The district court's dismissal of Lucas' Title VII and ADA claims rested on its assumption that discrimination claims against a federal employee union are essentially unfair representation claims under the CSRA when both sets of claims are based on the same conduct. That assumption is incorrect. Under a proper understanding of the respective statutory schemes, discrimination claims under Title VII and the ADA are fundamentally different in kind from unfair representation claims under the CSRA. First, as we explained in our brief, discrimination claims... Title VII and the ADA prohibits a broader range of union discrimination than the CSRA. Unlike the CSRA, Title VII, it is not limited to protecting bargaining unit members. It is not limited to discrimination with respect to the terms and conditions of union membership, and it is not limited to rights arising under a collective bargaining agreement. Thus, a plaintiff may have a discrimination claim against her union even when she does not have an unfair representation claim. Can you say something sort of concretely, factually, examples of what you mean? Like, when does that come up? What kind of behavior? And it seems to me that the relationship between someone in the bargaining unit and the union is principally a relationship of representation. I have two responses to that. One is, at a very broad level, the Supreme Court has addressed a very similar interpretive question in Burlington Northern v. White, where it was comparing Title VII's anti-discrimination provision that applies to employers and its anti-retaliation provision and what it held is that the anti-retaliation provision is broader in scope than the anti-discrimination provision that applies to employers because that provision is limited to discrimination with respect to the terms, conditions, and privileges of employment. That same reasoning applies with equal force in comparing Title VII's union provision and the CSRA anti-discrimination provision in 7116b-4. Can I ask a question about this? Because the facts before us are that it's the exact same conduct that underlies the unlawful labor practice as well as the Title VII claim. That's kind of a different question because it could be that there might be some instance in which there are Title VII claims that are not subsumed. But on the facts before us, it seems that the district court found, and I think it really conceded, that this is the same conduct. So we could do a narrower ruling that just addresses when the context is exactly the same. There is no Title VII freestanding claim. Well, that actually leads to the second response I was going to provide, which is one example of conduct that would fall outside the scope of the CSRA but would fall within Title VII scope occurred in this case. There was some harassment. I believe Lucas alleges that some of the harassment that occurred occurred after her employment with the SBA ended. And the FLRA dismissed her claim as premised on that conduct specifically because it fell outside of the union's duty of fair representation. So even if it related to the duty of fair representation, if she wasn't an employee, she couldn't bring it? At least that's the way the FLRA treated her claim, was to dismiss it, because at that point it reasoned the union could not have violated or breached its duty of fair representation. Well, could it? Was it wrong about that? Because I was just going to ask, I suppose sometimes unions work for former employees, grieving, for example, their dismissal. So does the union's duty to represent outlive the employment? Your Honor, there may be circumstances in which that occurs. We haven't taken a position on that. And if it doesn't, then in what respect does she have a claim against the union? Well, again, to the extent the CSRA does not encompass harassment that occurs after a plaintiff's employment ended, a plaintiff would not have a claim under the CSRA. But she also probably wouldn't have it under Title VII or the ADA. She may have a claim under Title VII and the ADA for discrimination that occurs post-employment. Title VII prohibits a union from discriminating against any individual and does not tie it specifically to current or former employees. So a union's harassment of a former member would fall within the scope of Title VII. I'm sorry, I just want to make sure I'm understanding this. Is it correct that if an employee is sexually harassed by a union representative and then is no longer an employee, she can't bring an unfair labor practice claim? Again, we haven't taken a position expressly on whether that would be the case, but that at least it's harder to see how that would fit within the... or fall under the CSRA. And in fact, again, that's how the FLRA treated Lucas's harassment claim here, at least the harassment that was based on conduct that occurred after her employment. The other thing I will note here... Okay, I'm sorry. So even if it still is in the context of a bargaining relationship or a bargaining unit relationship, if she's no longer an employee, there's no claim? It's difficult to see how that harassment would be part of the bargaining unit relationship. My understanding is, based on her allegations, is that the former president of her local called her and made harassing statements or abusive statements over the phone. I mean, based on her complaint, it's all in the context of and failed to represent her in her grievance against the agency in light of this, based on her sex. It's all tied to the union representation in her complaint. Respectfully, I would disagree with that characterization. I think the discrimination that Lucas identifies in her complaint generally falls into two categories. One is the failure to represent her in her grievances or in her arbitration against her employer, but she also alleges that the former president of her local sexually harassed her over a period of time. If you could point to the parts of the complaint that you think separates it from the representation, that would be helpful, because I see she said she had to endure a hostile work environment in order to continue with the arbitration. That's paragraph 107. And from my read, we looked for this. It looked like all of the allegations of sexual harassment were linked to the representation. They were linked only in the sense that the individual who was harassing Ms. Lucas was the same individual who was initially representing her in her grievance and arbitration proceedings. I understand, but we looked for it, and everything linked to sexual harassment. It was because she was a new representative, but it was also linked to the fact that, therefore, he wasn't representing her properly. So if you can find it, that might be helpful. I don't have the paragraph, and we're happy to submit a supplemental, but she does allege that the former president made sexual advances that happened during the course of his representation of her in the grievance and arbitration proceedings, but the fact that they happened at the same time I don't think necessarily means it was tied to the representational activity. No, but she said that in order to continue the arbitration, she had to endure a hostile work environment. Paragraph 107. But again, Your Honor, I think construing that, construing her complaint liberally, is that there is at least some of the harassment that occurred, again, concurrently with her representation by this individual, but the fact that she was... But if it were the case that the factual allegations are completely congruent, that the Title VII claims are completely congruent with the ULP, does that change your position for the argument? That doesn't change our argument, Your Honor, because what we are... The central premise is that discrimination claims are fundamentally different in kind from the unfair representation claims. There may be circumstances in which some conduct constitutes both unfair representation and discrimination, but there are going to be other types of conduct that constitute discrimination but not unfair representation. But in an individual case if all the conduct is the same, you would still maintain this? Yes, Your Honor, in part because it would be possible, even when it's the same conduct, it would be possible for the plaintiff to prevail on the discrimination claim and fail under the unfair representation claim. And that's essentially the conclusion that the Ninth Circuit reached in Garrity. And that's because the unfair representation claims under the CSRA are subject to more demanding substantive requirements. Courts accord deference to unions in determining whether or not they have breached their duty of fair representation and grant unions a wide latitude. By contrast, there's no reason to extend the same deference to unions in determining whether or not they discriminated against an individual on a protected characteristic. I don't think it was in the brief, but we have a pretty recent case, Patton v. D.C., which was about whether administrative remedies under the Randolph-Shepard Act in the federal program, state administrative program for blind individuals' employment and that that preempted suing separately under the ADA. And so it seems to suggest that there just isn't, you know, something special about anti-discrimination statutes that they cannot be preempted or displaced by an administrative regime that may have lesser remedies, that may not, typically doesn't have de novo judicial review. And I don't know if, I mean, do you have a response to that at all? Your Honor, I'll start by saying I'm not familiar with that case. I realize it's a little unfair for that reason. Not prepared to speak about it. What I will say is that the Supreme Court's cases and other cases have regularly noted that Congress has, or there has been, has evinced a general intent to provide overlapping and parallel remedies for discrimination. And in the NLRA context, for example, this Court has said the NLRB's exclusive jurisdiction over unfair labor practice claims does not give an exclusive jurisdiction over all conduct that would constitute an unfair labor practice. And that extends with equal force here. The FLRA's exclusive jurisdiction over unfair representation claims does not extend to all conduct that could constitute unfair representation. Just one question. So, assume that they were perfectly overlapping. I understood one of your main arguments to be that a key feature of Title VII and ADA, and the ADA is they provide compensatory and punitive damages because Congress thought those were the remedies you need to eradicate these appropriate types of discrimination. And so... is that correct? Do you think that's an independently sufficient reason? If we're asking, did Congress intend to strip this away from public sector union employees and only those employees, you know, what role do you think that disparate remedy should play in our analysis? I don't know that it's independently sufficient, but it's certainly relevant. We have not taken a position on whether Thunder Basin is the appropriate framework within which to consider whether the CSRA precludes Title VII. But I will say that this court has recognized that under Thunder Basin, in determining whether a claim is wholly collateral to the comprehensive scheme, you look at whether the plaintiffs aim to obtain the same relief they could seek in the agency proceedings. So the fact that compensatory and punitive damages would be available in a district court but not in the administrative scheme is at least a relevant consideration. Okay, thank you. Are there reasons that Thunder Basin would not be applicable? Again, Your Honor, we have not taken a position on whether Thunder Basin is the appropriate framework, and that's largely a function of the way this case arose in the district court. All right, thank you. And we'll hear now on behalf of... AFGE from Mr. Vinson. Thank you. When Congress enacted the CSRA, we know that Congress gave deliberate thought to discrimination vis-à-vis the unions and their bargaining unit employees because it said so in two different places, in 5 U.S.C. 7114A1 and 7116B4. The meaning of discrimination in 7114A1 cannot be narrower than the discrimination listed in 5 U.S.C. 7116B4. The 7114 lays out the duty of fair representation, and it says that unions who are the exclusive representatives cannot discriminate... I'm sorry, must represent the interests of all employees in the unit without discrimination and without regard to labor organization. So there are two things that are under consideration. Without discrimination, which we find in 7114A1, and with regard to labor organization. Here, it's clear that Lucas is simply repackaging her ULP claims to get another bite at the apple regarding the union's conduct. This court should reject that notion. Can I ask, is it your understanding that she was a member of the union or that she was just a member of the bargaining unit? Because we're working with the operative complaint, and the operative complaint says that she was kicked out of the union, my position is she was a member of the union at the time. In addition, when you're looking at... I know that there was a comment that one of my brothers mentioned that in regards to 7116B4, we're talking about membership. It's not just about membership. We know it's not just about membership because in 5 U.S.C. 7116 says, for the purposes of this chapter, it shall be an unfair labor practice for an exclusive representative to oust a member. So in 7116B4, we're not just talking about discrimination, whether or not you're going to kick the member out. We're talking about the terms and conditions of that membership, whether or not they get represented properly based upon their race or they're not getting represented improperly based upon their race in all the protected classes. Regarding the Thunder Basin, we rely on Trump. Trump is on point here, and the AFGE beat Trump. This court said that AFGE would be able to get meaningful review by filing ULPs. That is what Ms. Lucas has done here. The fact that Lucas' claim was dismissed was only because it was untimely. We can't reward her for an untimely action on her part. To award her with allowing her to proceed in district court based upon there's no meaningful judicial review in her case because her case was dismissed would undermine the purpose of the statute. That would allow plaintiffs like Lucas to circumvent the statute altogether by filing a complaint later and then saying, well, we get through the Thunder Basin factors because I can't get any meaningful judicial review. It seems like fundamentally that point is that you think it would be really strange for there to be a ULP proceeding before the agency based on the same facts at the same time as a Title VII claim based on the same facts. One of the key responses from Lucas is that that's how it works everywhere else other than in suits involving public sector unions. It kind of raises the question, why in this context and in only this context, not for suits against agencies, not for suits against private unions, why would Congress have wanted to preclude the ability to have a resort to this fundamental Title VII ADA-type remedy? When you think of the purpose of the overall CSRA scheme, it was to prevent claims being litigated in different forms, facts being developed on those claims in different places, coming up on review, and what Congress said is, we're going to remedy all of that. We're going to create a comprehensive scheme that's going to address any type of labor management issues that would prevent this type of duplicative litigation. My brothers point to private sector law, but that argument is weak. In the private sector, the unions are governed by the NLRA, and the NLRA, unlike the CSRA, does not have exclusive jurisdiction over the unfair labor practice complaints or the duty of representation claims. Section 301 of the NLRA allows union members, employees to go into district court with those claims. So to compare private sector with the public sector union, in this case, would be inapplicable, because we know that the exclusive jurisdiction of the NLRA over all ULP claims, we know that from carrier haliosis, that that's specifically what the court had in mind. But aren't a lot of, there are a lot of CSRA claims that don't sound in Title VII or ADA discrimination, right? So all of those claims would be addressed by Congress's streamlining and unifying desire, right? Absolutely. The Back Pay Act, the APA claims, constitutional claims. Right. So that statute would still, in large, be functioning the way that Congress, you know, that, I guess the question, to make this a question, why wouldn't we just think, well, yeah, Congress had that objective, but only to a point, and it is manifest in all those other areas, but not in the area of Title VII and ADA, which have had this concurrent treatment as the more standard model. Well, in the private sector, like I said, there can be concurrent jurisdiction, because one of the things that we're taking, that's taken into consideration with the private sector is the strength, the number of rights that the employees had to give up. Think about it this way. Under the private sector, the management and the union control the arbitration process. So if an employee is terminated and the union decides arbitrarily, well, we're not going to take your case to arbitration, then the employee would have, he or she would be out of luck. The courts wanted to balance that power, and they said in VACA that what we're going to do is we're going to allow these claims to come, we're going to allow these claims to come into court so that we can address these claims, because obviously the union is not. We don't have that type of problem in the federal government here. When employees join unions, the statute provides relief through the Mayor's System Protection Board, an employee can file an EEOC complaint to challenge termination. Those are all part of the statute, so you don't have those instances where your only recourse is to go through arbitration to challenge termination. Can you address the wording in the statute, no, there is an express savings clause with respect to discrimination by agencies, and there is no express savings clause with respect to the union. What is the significance of that? Because your friend on the other side says they should be read to be the same. No, I don't think it's significant enough because Title VII federal government employees sue their agencies through 29 CFR 1614. Those type of claims are addressed all the time against management. That's not the structure that we have here. Rick, the CSRA, the FRA, governs the conduct of the union, not district courts. So I don't find any significance in that at all. I meant the significance of the fact that there's express language in the statute dealing with agencies. It says that Title VII claims are not precluded if you are suing your agency. But that same language, Title VII claims are not precluded, is not included with respect to your union. I think that it is. I think that when I think that Title VII claims are subsumed in the statute, in the duty of fair representation, 7114A, it says you cannot discriminate based upon membership or any type of discrimination. And we know that in 7116B-4, it lays out the different types of discrimination that applies in Title VII cases. We're talking about race. We're talking about religion. We're talking about disability. So when you think about 7114A-1, you have to come to the conclusion that this general provision is going to encompass that under 7116B-4. What 7116B-4 offers is also included within 7114A. I understand that textual argument. Are you aware of any FLRA cases or district court cases saying that, that the 7114A provides basically a cause of action for racial discrimination? Well, I know in two cases, at least, in Blankenship and Price. These are cases that were identified in EEOC, the amicus brief. In both of those cases, the employees filed discrimination claims, one on sexual orientation, one on, I believe, age and disability and gender. The FLRA took up their charge and issued a complaint in their case. I just have a separate question. I mean, what do you think of as your best case? And the question is that most of the statutory cause of action that we've found precluded by the CSRA or the FSL-MRS are very broad. We've even called them kind of catch-all statutes, like the APA or the Backpay Act or a Bivens action. And at least arguably, there's a huge distinction here in that Title VII, the ADA, the FLSA are targeted specific statutes, targeted at specific problems. And sort of like what Judge Pillard was suggesting, this wouldn't be a complete end run around the agency process for every single... The concern in the APA case was you could call every single CSRA discharge challenge, you could convert it into an APA challenge. And that concern's not present here. And so to try to turn this into a question is, do you disagree that all the prior cases have involved these kinds of general catch-all statutes? No, I believe in FALSO, in FALSO there was there was CSRA preemption... Of APA claims, I believe. No, the Tucker Act. The Backpay Act. And in that case, they were able to... I think this is how the court resolved it. There wasn't an extension of a claim under the Tucker Act, but that there was a different source of review. And in this case, that's what we're talking about. The source of review for these Title VII claims for UEFA representation are exclusively within the realm of the FLA jurisdiction. That is challenging as a practical matter to accept, that it's not extinguishing the claim, but funneling it into a different route to review because of the reliance on the general counsel having to refer or file a complaint, which, as far as I'm aware, hasn't happened in some 20 years. So it just seems like the FLRA is where claims go to die, not where they go to be alternatively processed. I appreciate that point, but that's a congressional fix. That's going to take a congressional fix. One of the other things that came up was regarding employees and what happens after they are no longer employed. And 5 U.S.C. 7103 actually says that for ULP claims, if the employee dismissal was an unfair labor practice, then they would still be considered an employee under the statute. Again, considering the different power dynamics between the private sector and the public sector, we have here another case where we can say at least if an employee needs to challenge a termination and there's an unfair labor practice associated with it, then they would get redressed under the FLRA. I have a question. Your opponents are very clear that they don't think it matters what the nature of the content or factual circumstances of the claim are, that none of them are subsumed under the CSRA. And is your position equally categorical on the other side, that it doesn't matter whether it's something that also looks like or could be packaged as a ULP? It's just, you know, a claim against a union under Title VII or 88 is necessarily a claim of unfair labor practices and therefore displaced? Well, speaking to this specific case, I'll give you an example. What we're talking about here for Luke is what she wants is for her grievance to go to arbitration. And all throughout her complaint, she's talking about, my arbitration was delayed, it was delayed, it was withdrawn, I wasn't getting representation. All of that language is around the collective bargaining procedure, the collective bargaining and grievance. So she has... But what I want to know is whether as a legal matter in terms of what you're asking us to do is to say, well, we're not going to reach the broader question about whether someone who might have a Title VII claim or an 88 claim that can't also be packaged as a ULP might have a surviving civil rights claim because that's not this case? Is that what you're asking us to hold? Or are you saying, look, the courts have been clear that it doesn't matter whether there's an effective remedy here or not because the only... It's all about the union's duty of fair representation. It's all vacuumed up into the CSRA. Yeah, I can think of an example. I know because in the EU case, we're talking about what is the exclusive jurisdiction of the union? So on matters... Let's say if the union was offering some type of insurance plan and they say, well, we're only going to offer insurance plans to black people or we're going to only offer insurance plans to white people. That would be something that we... The FRA does not consider that to be under the exclusive jurisdiction of the union. What's under the exclusive jurisdiction of the union are the matters under the collective bargaining agreement. So you would... I mean, we're not bound by... And working conditions. Yeah, we're not bound by it, but there's this Dixon case from the First Circuit, plaintiff alleges she was sexually harassed on an official union trip, and that's not... That would not be subsumed within the CSRA scheme because they're going out on a... Basically on a field trip to another city and the person gets sexually harassed. There's just not an argument there that that is affecting the duty of fair representation, so that would not be preempted in your view? Well, our position on that is that... Those type of hostile work environment claims don't apply to unions. Don't what? Those type of harassment claims are not actually written into the statute. When you look at 42 U.S.C. 2000 E2, the language is, to exclude or to expel from his membership or otherwise discriminate against any individual because of his race, color, religion, sex, and national origin. When you compare that to the employer practice where it says... It's an unfair labor practice. To fail or refuse to hire or otherwise to discriminate against anyone, any individual with respect to his compensation regarding the terms, conditions, or privileges of employment. So it's the employer that controls the terms and conditions of employment, not the union. But if the union is sponsoring something, like you said, insurance or a trip, with union collective bargaining unit members, that would be under the auspices of the union, not of the employer. And I'm just trying to probe, if you think that not every discrimination claim that a member of the bargaining unit might bring against the union is necessarily packageable or susceptible of being treated as a breach of the duty of fair representation, my question is, what is the test for what is in and what is out of the footprint of preemption by the CSRA? As far as a harassment claim? Any claim. Any claim. I mean harassment claim, but it's the same facts. Is it that the same facts could support ULP or is it that the plaintiff has packaged it that way? Well, within the FRA's administrative scheme, it identifies eight or nine ULPs. So those ULPs, we know that carry a list of FRA's exclusive jurisdictions. When you say a list of eight or nine, what are you referring to? 5 U.S.C. 7116. But even in your example of the insurance policy, wouldn't that be a term of membership? So why wouldn't that be discrimination under 7116B4? Because that's a term of membership if you're offering members insurance on a racial classification basis. Why isn't that a ULP? I would say not members, but new employees. So when you're trying to draw the line, I can't give you all the contours or you can draw the line. That's probably something that's left to Congress. So is it your position, then, that anything that is related to a term or condition of membership under B4 or discrimination under 114A1, that's preempted and anything that's not, something that, say it involves your union representative, but like as Judge Pillard said, it's completely removed from the representation. They're just like on a field trip and he sexually harasses her. Would there be a Title VII claim for that? Well, like I said, I don't read the hostile work environment theory as to unions. I read that as something that the employer is... What if we think it does? Would that be a Title VII claim or not based on the fact that it's not related to the union representation? If it's not representation, if it's not something that's within the exclusive domain of the union, I believe the CSRA has a remedy for that. An employee could file a complaint under 5 U.S.C. 7120. They could file a complaint with the Secretary of the Army alleging that there is a standards of conduct issue. I know that with ASGE, when there's a constitution, at the time that Lucas was, at the time of her claim, Article 23 addresses harassment by union officers. So then there wouldn't be a Title VII claim because you could address under 7120 of the CSRA? Well, it's hard to say that sexual harassment is representation. I will concede that. That is not representation. But in this case, Lucas's complaint is about, the way I read her complaint was that she had to endure the harassment in order to obtain representation. So we don't have to decide what would have happened if there was sexual harassment not related to representation? I wouldn't say in this case. When you're looking at a hostile work environment claim, you're looking at how that harassment is affecting the terms and conditions of employment. And if you notice with Lucas's complaint, you don't see, there's no context to where that harassment happened. We know that local president Johnny Green was in Arkansas and Lucas was located in Washington, D.C. and she doesn't identify where this harassment occurred or how it affected the terms and conditions of her employment. Let me ask you a question about sort of the adequacy of the CSRA remedy. One of the key cases, as you mentioned, is Elgin v. Department of Treasury where the Supreme Court held that CSRA preemption was favored under Thunder Bay Station because ultimately, even if it wasn't, even if the administrative process wasn't competent to decide a constitutional claim, ultimately the court would address it in the first instance. Is it your position that the same would be true of a Title VII or ADA claim, that if it wasn't addressed as a Title VII claim or as an ADA claim in administrative processing, would the Federal Court of Appeals under 5 U.S.C. 7123 address the Title VII and ADA claims if it ever got to court? Is that the argument? Absolutely, absolutely. I think that we learned from Thunder Bay Station that even if the FLRA doesn't have the expertise, under the FLRA, they have an administrative scheme, they can develop facts, they can get witnesses, have a factual record, and even if they don't have the expertise to deal with it, in Elgin's case, even if they don't have the expertise to deal with a constitutional issue, then the Court of Appeals would be able to deal with it. So it would be the same instance here if such a claim were being challenged. And I think what's important about Elgin is that Elgin instructs us to not look at the legal label around the action. It instructs us to look at who the employee is and what conduct is being challenged. And we know that Luke is the employee, the CSRA government employee, and the conduct that's being challenged is the representational conduct of the defendant. And viewed in that light, we're not talking about a different beast. Except potentially the harassment, which as you acknowledge is not representational conduct. Another question about... I'm sorry, I just want to clarify that point. I thought you said that the harassment in this case is representational, because she said in her complaint she had to endure sexual harassment to get representation. That's how I view that claim. So even though sexual harassment in some contexts might not be representational in this case... Absolutely. I think it would be hard to say that sexual harassment is representational. So what is the role of relief? I think it was in Axon and also in the AFGE v. Trump case, we've held that whether something's considered a collateral kind of claim, collateral to the statutory scheme and therefore surviving it or more closely woven into the statutory scheme turns in part on whether the plaintiff is seeking the same relief that they could obtain. And in this case, Lucas is seeking damages, and that's not something that she can get, compensatory damages through the CSRA, is it? I don't understand that, but we also know from AFGE v. Secretary and file marks that under the CSRA you get what you get. Right, but those weren't Thunder Basin analyses, were they? No, no, no, they were not. And don't we have to apply Thunder Basin given and have in our cases more recently applied it given that that's a Supreme Court analysis? Well, I think in this case those factors are in the defendant's favor. We know that through AFGE v. Trump that the FRA administered the scheme through filed UOPs has been deemed judicial review, meaningful judicial review. And in this case we know that Lucas... Well, that case didn't involve just UOP claims. It didn't consider the argument that for this lane of potential judicial review that GC basically has unilateral authority not to institute and that that defeats judicial review. And that case doesn't tell us how to think about that for purposes of Thunder Basin Factor 1. Well, I know that... Yes, as far as... So I guess the question would be, I mean, Lucas places a lot of emphasis on Thunder Basin Factor 1 and the idea that we should look at this similarly to Free Enterprise Fund where there's a meaningful chance, a very meaningful chance it turns out that there won't be any judicial review. And why shouldn't that weigh heavily in Lucas' favor? Well, I know in JOCSI we're not looking at all the issues separately. We're looking at them together. And there were different circumstances for Enterprise. I know Enterprise, they had to incur sanctions that would have cost millions of dollars in order for them to obtain some type of relief. They had to vet the farm, is what the court said. And in Exxon, it's a different beast as well. In Exxon, they were actually challenging the entire administrative procedure and they didn't want to have to go through this. It's a here and now injury. They didn't want to have to go through the procedure because that wouldn't be meaningful if they had to take the time to go through a procedure that they felt was unconstitutional. Can I ask, though, with respect to all of the unfair labor practices that are listed, is it the same procedure where the general counsel can just not pursue the claim and then there's no right to review in the courts? It's not just the discrimination claims that go through this, right? All UOPs go through the FLRA administrative scheme. So it's all the same process no matter what type of UOP it is, whether it's discrimination or one of these other ones. You file your complaint. The general counsel decides whether or not to help prosecute it, I guess. And then if they choose not to, that's not appealable. They can appeal to the general counsel and then that's what Ms. Lucas has done in this case. But then if the general counsel chooses not to, I guess, proceed with the claim, then that's not appealable. The general counsel's decision, is that right? For all UOPs. Right, the general counsel's decision on that matter is not appealable. So I guess trying to reconcile Fender-Basin with some of the other cases that we have with respect to how to think about relief. Fender-Basin gives a framework for trying to figure out congressional intent and it leads to an assumption one way or the other, but not a definitive answer. But if direct evidence of congressional intent, if not going through Fender-Basin, but just, because Congress can just decide there's no judicial review here. Congress, if you're not trying to divine congressional intent by figuring out if there's judicial review, putting that aside, Congress could decide there's no judicial review here, and that's why we put it in 7116B, which deals with UOPs, none of which get the kind of judicial review we're talking about. Does that make sense? I think that when Title VII of the, I can only assume that when Title VII of the Civil Rights Act was created, they wanted to have a body that would be able to address labor and management relations issues. The general counsel of the FLRA would be in that position, the best position to determine whether or not there is an issue regarding the union's conduct, whether or not their conduct breaches the duty of fair representation. I think that expertise is within the FLRA for a reason. They're the ones that are most, they're the experts in what conduct is a breach of the duty of fair representation. Thank you. If there are no more questions, I ask that you affirm the district court's decision. Thank you. Thank you. Mr. Matz, is there a time for rebuttal? Sue? May I please, I'd like to make just a couple of factual points, and then some legal points. First, Ms. Lucas was not in the union. This is clear at JA110, which was an exhibit attached to their motion to dismiss below. It's a decision by the regional director that says you are not a dues-paying member of the union. That is consistent with the fact that in their brief, they refer to her as a bargaining unit employee and not as a member of the union, and it's consistent with the fact that they never cite the provision of the statute that applies to members of unions. Second... So does that mean we don't rely on the complaint? We should rely on this exhibit instead? This is a Rule 12b-1 issue that comes up on appeal, and that posture, to the extent there's any consistency between the complaint and other materials that are properly before the court, the court may choose to treat the factual conflict as confirmed by the more authoritative document. What's your authority for that? I don't have a case on hand. I mean, I think it's fairly common practice that in the context of a 12b-1 motion, where there is an allegation that is contradicted by evidence that's directly in front of the court. But I want to come back. But there isn't also an allegation that's contradicted here in any direct sense. Ms. Lucas refers in both of her complaints to being a member of the bargaining unit. She doesn't specifically use the word, I joined the union, I was a dues-paying member of the union. She never says that. The only reference to her being in the union is, I think, an incautious reference to her having been fired from the union. But the combination of the regional director's report, which was attached to the motion, at the very least, it stops them from now taking that position, which is also just, well, not supported by the record. The second point, again, this is a factual point, and then just one or two legal points that the court will allow me, is that, Judge Penn, you suggested that all of the discrimination in the complaint concerning sexual harassment wasn't expressed in the context of the representation. We disagree with that, and we would point to Joint Appendix, page 17, paragraph 103, which is the third cause of action is for hostile work environment. And paragraph 103, it simply says, based on plaintiff's sex, she endured unwelcome sexual conduct in the form of sexual advancements from Johnny Bean. The fact that that occurs in a complaint that more generally talks about him having represented her does not turn that stand-alone allegation into a representational claim. But anyway, on to the bigger stuff. So, just very quickly, the first point is that, Judge Pillard, to your question about Patton v. DC, I would just sort of quickly note that in that case, the court emphasized specifically, and I quote, that it was comfortable precluding the ADA claim, which is the only time I have seen an anti-discrimination law claim precluded, because, quote, requiring exhaustion would merely postpone rather than preclude a judicial assessment of plaintiff's claims in light of the availability of the APA remedy. And the court also noted that the Randolph-Shepard Act, which was the law that was at issue in that case, actually provided a highly specific remedy for the precise issue there, which was ownership of vending machines in federal facilities by blind individuals, which relates to, Judge Garcia, the point that you made, that when there's a much more specific provision, it's not uncommon to think that that would directly apply. But the bigger picture takeaway, I think, from the argument that we've just heard, is that they don't ultimately deny the broader point that there is nonjudicial review in the vast majority of circumstances coming out of the agency here, and that there is essentially a skim milk discrimination regime that applies. Their solution to that seems to be that you engage in this case-by-case analogy where you ask if the conduct alleged to be an unfair labor practice sort of overlaps with conduct that would otherwise also be within the scope of Title VII or the ADA or the FLSA. As I think we all have just experienced, that is not the most workable undertaking. That's true in part because there's essentially no FLRA jurisprudence or guidance around that. In practice, this would mean people would have to file all sorts of Title VII cases directly in district court, and there'd be a district court case-by-case analysis of what all of these provisions of this GSRA mean, and then you have to compare it to all of the things in Title VII and try to figure out exactly what the difference is. Not only am I unaware of any court ever doing that in a Thunder Basin analysis, and not only is that inconsistent with the Thunder Basin analysis, but again, I think there are significant practicability problems with thinking of it in those terms, which is why courts have not asked, you know, is the substance of your claim something that you can get some relief for internally, and if there's some overlap, it's precluded, and if there's not some overlap, it's not. Instead, they have framed it much more as are claims of this kind precluded as a group, or are they not precluded as a group? And here, in my mind, the absence of judicial review for claims of discrimination is a towering fact, as are the other considerations I highlighted at the beginning of the argument. Now, again... Can I ask a question about this idea of the specific governance over this general? Isn't the GSRA's discrimination provision more specific than Title VII? Title VII is more general. It applies to all discrimination. GSRA applies to a subset of that, which is in the context of unions and union representation. So the specific, if that's the one that's supposed to apply, would be the GSRA, right? Possibly. So first, that's not the test I'm proposing. I was just indicating that in the Patton case, that was a subsidiary consideration that on top of the presence of judicial review led the court to feel safer with its resolution finding. But even in this context, you know, when you're talking about a non-union member like Ms. Lucas, the discrimination provision is 7114A1, which is, let's say, as general as it can be. It literally just has the word discriminate. And then for even union members... I'd like you to speak to when you get a chance, like the fact that their position is that they can't... They're co-extensive. They can't be broader or narrower than each other, the two provisions in the GSRA. That's 7114A1 and 711B. I mean, first of all, that's a new position that sort of came up today at arguments. It wasn't in their papers. It wasn't addressed below. But even to the extent that they want to say that you should treat discriminate in 7114A1 as the same as the kinds of discriminations specified in 7116B4, which is not an obvious thing to do given that the statute seems to go out of its way to create a specific set of protections for terms and conditions discrimination in the context of labor organization membership. The reality is that in both of those cases, you still end up, as my friend from the EEOC explained, with a regime of anti-discrimination protections that in their process, in the remedies that are available, and with respect to the scope of discrimination that's prohibited, potentially including in the context of some sexual harassment or former employment contacts and other examples that he gave, you end up with a weaker anti-discrimination regime. And the question is, did Congress intend a weaker anti-discrimination regime? And I think when you ask the question in those terms, did Congress intend that you would extinguish Title VII and then down the line ADA and NFLSA remedies under the Thunder Basin factors given the absence of judicial review, the proper conclusion is no. The one other thing I... Oh, please. In my thought about trying to reconcile the Thunder Basin factors with the cases that don't apply them or the cases that just talk about release being not relevant, in my mind, I'm thinking through, like, how do you reconcile these kind of two sort of seemingly contradictory lines of cases? And it seems to me that the Thunder Basin factors are... They create a presumption. They're a way of trying to divine congressional intent. And sometimes you have more direct evidence of congressional intent putting aside the Thunder Basin factors, such as... Because Congress could explicitly say, we intend that there be no judicial review for discrimination claims against unions under the CSRA. They could say that. And so if there is more direct evidence that that was their intent, how do you reconcile that with Thunder Basin, which is a presumption that relies on sort of other factors? Sure. So I think, again, I just sort of take Thunder Basin and they seem to agree as the controlling analytical framework given by the Supreme Court and applied by the court, by this court repeatedly in the context of the CSRA. And in the more recent cases, I think uniformly, the cases where it didn't apply were older cases. And I agree with you that Thunder Basin, it's a series of thumbs on the scale, right? And it frames the question very much as one of congressional intent. Congress could have intended that there not be Title VII at all, right? Congress could say that there's Title VII, but you only get a particular remedy. Or Congress can say, you have to bring all of your discrimination claims in this setting, in this process, and you can't go to court. That is absolutely within Congress's power. The question that I think the court has to ask is, Congress didn't expressly say that. If Congress doesn't expressly put a savings clause into the statute, how does that fit into Thunder Basin? I think, again, from our perspective, and you and I have had this colloquy, so I don't mean to repeat myself, but I think the fact that they contemplated continued judicial jurisdiction over these claims in the district courts in the context of Title II, in my mind, supports the conclusion that they generally understood their scheme to have to be consistent with concurrent jurisdiction. That's not really the question I'm asking. I'm just talking about strictly in terms of Thunder Basin. If we have a statutory provision, pretend there is no Title II, and they've just not put in there. So we've got case law that says when Congress wants to carve something out of the CSRA, they say so explicitly. There's nothing explicit here. Without explaining why that's okay, I just want to understand, how does that fit into the Thunder Basin framework? Statutory arguments, statutory types of arguments, how does that fit into Thunder Basin? Sure, and I take your question, what you're saying. I just want to know how to answer your question. I appreciate it. And so, there's a line of cases that says, with pretty strong general language, if Congress wants to pull something out of the CSRA scheme, it needs to do so in a pretty clear way. And under Thunder Basin, there's a line, there's a test that you use to ask whether that's happened. And I take your question in having reconciled those two things here. In my mind, the way that you reconcile them, first and foremost, and I'm just sort of going with what Justice Kagan has repeatedly told us in Acton and in Elgin, is that Thunder Basin is the test. It frames what the inquiry is. The fact that this court... I'm asking you, how do I, which of these three things under Thunder Basin does this fall under? Sure. So, principally it falls under the first, the second step of Thunder Basin, the first consideration, which is about the unavailability of judicial review. And I cited the Free Enterprise Fund case. They say that's distinguishable because you there would have to bet the farm to get judicial review, but we don't even have the choice of betting any farms. Ms. Lucas doesn't own a farm. But we don't have the choice of betting anything to get judicial review. We're just totally excluded from it in this situation. But that's the first Thunder Basin factor. The other two Thunder Basin factors are about whether the claim is wholly collateral to the agency's process and whether it's outside the agency's expertise. And as I highlighted in my original presentation, I think there are strong arguments for us on both of those points. I also appreciate that the way the courts have described those points are not always consistent. So the collateralness consideration sometimes is about remedies. Sometimes it's about is it in the same subject area? But we think there are additional considerations that I highlighted at the very beginning about... I think I just hear you arguing why you went under Thunder Basin as opposed to answering my question, which is I'm just trying to figure out analytically how that works, but that's okay. And your question, just to make sure I have it, is how do we prevail despite cases that say that you need an express carve-out? I'm saying I see Thunder Basin factors as relying on three different things and doesn't really take into account case law that says we look to the text and the structure, whatever, of the statute, and if Congress wanted to do this, they would have done it explicitly. But statutory language is not one of the three things under Thunder Basin, so how do I reconcile case law that says I'm looking for congressional... My ultimate goal is to figure out congressional intent. I've got case law that says congressional intent should be expressed in this way. I've got the Thunder Basin factors that don't take that into account, and I'm trying to figure out how to reconcile them. Thank you for clarifying that. There are, in a number of cases, including the Hoosier case, the Jarkazi case, and the Axon case, the Supreme Court has been really clear about the answer to this question, which is those three considerations are essentially just guideposts. They're not an exclusive test. And so I think it is totally correct to think that you look at the broader statutory structure and to all the other evidence that would ordinarily bear on an inquiry into congressional purpose in asking whether claims of this kind were meant to be precluded. That's why, for example, I'm relying on points like the presumption of concurrent jurisdiction that the Supreme Court highlighted, which also is not an obvious fit for one of the three considerations under Thunder Basin. I think Thunder Basin tells us what the question is and says here are some things that should bear on that inquiry. But it's not exclusive. It's not exclusive. And the fact that this court has had some broad language indicating that the CSRA is sort of preclusive a lot, but with respect to Judge Garcia and Judge Pillard, I think pointed out with respect to very broad things like the APA or due process claims, in my mind doesn't answer the more specific question where you have a presumption of concurrent jurisdiction and where you're really asking do federal employees like Ms. Lucas ultimately just get second-best anti-discrimination law. Thank you. Thank you. Thank you. The case is submitted.
judges: Pillard; Pan; Garcia